The last case on our day calendar today, Dr. Joseph Irrera v. University of Rochester, et al. Good afternoon. May it please the Court, my name is Stuart Carlin. I represent the appellant, Dr. Joseph Irrera, in this case. The primary issue, at least I believe the primary issue, is whether or not there is a continuing violation as set forth in the amended complaint. This was a 12B6 motion. I believe that the district court failed to recognize that there was a lack of a proper response from the school that led directly to Professor Humphreys taunting Dr. Irrera in an inappropriate manner when alone with him, such as in the elevator, passing the hallway when nobody was around and in the stairway. The harassment was clearly sexual in nature. It dealt with him winking, blowing kisses, raising his eyebrows, looking up and down in a sexual way. The conduct occurred on a somewhat regular basis, several times a month. It was continuous from the time he had initially brought his initial complaint of sexual harassment to the school, which was in February and March of 2012. The sexual taunting continued because basically the school didn't do anything in terms of any sort of investigation when the initial sexual harassment was brought to the attention not once, not twice, but over, met him and his father and Dr. Irrera alone, met with various deans in the February and March time frame. The defendant failed to follow its very own policy regarding the sexual harassment investigations that actually basically gave the green light to Professor Humphreys to harass him in this way. In addition, Professor Humphreys had an unusually powerful position in this music department. He controlled the admission process. He controlled the evaluation process. He was a significant power in the department itself. In fact, the amended complaint is replete with example after example after example of faculty members who would not confront Humphreys or even administrators who didn't want to confront Humphreys because of his basically power in the school itself. What was his power beyond being the head of the piano department? Well, he had a lot of contacts in the music business, which is alleged in the complaint. You aren't referring to power necessarily at the university. Well, yes, there is a number of examples of professors not willing to confront Humphreys. In fact, there was a time when Dr. Irrera was taking piano lessons with another professor, and I may be mispronouncing her name, I apologize, Anton Minova. And as soon as he filed his complaints, she said, I can't be seen with you anymore. I won't even make eye contact with you anymore, particularly if Humphreys is around. That's the power that was dealt with, that Humphreys had at the school. And basically, my client's entire professional career in the record cites the many accomplishments he had going in, playing in Carnegie Hall three times, Steinway artist, there are a number of, I won't mention it. It's already well set out what kind of qualifications my client had at the time. So I would respectfully submit that the sexual taunting and mocking occurred because the university failed to follow its own policy, and thus Humphreys had nothing to fear by doing the sexual taunting. And if it's a continuing violation, then one could reach back to the April 2010 date where there was an actual physical touching. I don't need to go into that. It's set forth with a great deal of specificity. And I would respectfully submit that at least the continuing violation is present as a result of the university's inactions. They may try to allege, well, he should have complained about the taunting. However, there are comments made on a couple of occasions by Humphreys that if he continued to pursue the sexual harassment complaints, that he would make, quote-unquote, his life a living hell. Given the fact that he's a student in his whole entire professional career, basically is riding on whether or not he can get out of the program, I would respectfully submit that he did what he was supposed to do. He brought the complaints initially to the attention of the University of Rochester, to various deans, and nothing happened. The other issue I'd like to address is the causation issue on the retaliation regarding the internships. And I'm sure the court is aware there's a long line of cases that says, well, once you get over a year, it becomes problematic because the temporal proximity is just too far away from the initial complaints. Well, it's too far away if all you're relying on is temporal proximity. Aren't you arguing on direct, relying on direct evidence of, at least as alleged in the complaint, of retaliatory animus? Yes, Your Honor, and there are a number of examples that were cited in and of itself that the retaliation did continue, culminating in him not being able to get an internship, a paid internship. This is not a voluntary internship. And basically the explanation was that he doesn't qualify for an internship upon graduation, which is, my client learned, just a false statement because he knew four or five of students who graduated in his class who in fact got internships after graduation. There's no plausible explanation other than retaliation pertaining to the issue of the internships because it's a patently false statement that was made by the university, and there's no explanation other than retaliation. I see my time is up. Thank you. Thank you. Ms. Blankoff? Good afternoon. May it please the court, my name is Marion Blankoff. I'm with the firm of Nixon Peabody, and we represent the defendants in this action. We are here today asking the court to affirm the ruling of the district court below, which dismissed the complaint as a matter of law. The essence of this complaint is that a former student, the plaintiff, is trying to reach back in time to find a reason so that he could challenge certain academic marks that he received, which he disagreed with. Despite receiving these negative remarks on his first two attempts at his solo recitals, the plaintiff nonetheless continued on to graduate from the Eastman School of Music and receive his doctoral degree. And yet again, when he could not find a college-level teaching position, which he wanted, he again reached back in time to try to connect that failure to the former already time-barred incidents that had occurred. Well, part of his retaliation claim does not reach back. Part of it is he believes that perhaps with discovery, he would establish that within the limitation period, the school acted adversely when he applied for positions. So I understand you. Part of it is reaching back, but part of it is not. Yes, that is correct, Your Honor. With respect to his claims that are based on his cause of action, in which he asserts that Dr. Humphreys must have provided some negative references to prospective employers, because that is surely the only reason why he couldn't have received those positions. But even at the complaint stage, at the pleading stage, there still has to be allegations of fact that give rise to plausible inferences to support his claim. His allegation is he graduated from one of the premier schools, and he applied to 28 institutions and got not even an interview with any of them. So it's not as if he says nothing. He alleges those facts and suggests that there's an inference from them which is at least plausible. The inference that comes must be more than just, as the Supreme Court and Iqbal said, a sheer possibility. That's why I used the word plausible. I didn't call it a sheer possibility. I said his argument is that the inference is plausible. But nonetheless, even if the inference is plausible, he still must come up with some plausible inference that shows a violation of Title IX occurred. In other words, a plausible inference that the reason he didn't receive a position was because there was some sex discrimination or retaliation that qualified as a violation of Title IX. Retaliation for complaining about sexual harassment. Yes, Your Honor. That's what he's alleged. Yes, but in this case, because of the, and as the court found below, the plaintiff was not able to establish the required causation because even his allegations consisted of speculation and conjecture upon conjecture. Well, it's a little hard to fault him for not knowing what the references were when he's been thrown out before there was any discovery. How could he possibly know? He could have contacted any one of his 28 alleged contacts of future employers to find out whether, in fact, they had provided. Universities make a practice of when somebody calls up and says, I wasn't admitted to your institution or I wasn't offered a job by your institution. Please tell me who gave me a bad reference. They answer those inquiries on a routine basis. I don't know that. I know. I know the answer to that, and you know the answer to that, and the answer is they do not. But nonetheless, the absence of the allegations in the complaint still were so, they were so deficient that. Why is it not a plausible inference if you allege, and this could all be lies for all we know. We'll find out if there were a trial or summary judgment record. If someone alleges, this man made sexual advances to me. I said no. He was angry. Two, he told me he would make my life a hell if I persisted in making complaints about this, and he told me I would never get a job in a university. Now, of course, perhaps that's because of his poor performance. We don't know. Based on that, is it not, and finally, he makes the allegation that this is a very prestigious institution and a very prestigious degree, and he got no nibbles at all from institutions that he alleges would be expected to contact, and he alleges that the dean told him that you can't get away from Humphrey. There's no point in changing your teacher because he's all over your transcript, and anybody you apply to is going to call him, which, of course, they would because, it is alleged, he is the most prominent member of the department, and he's the man who taught Mr. Herrera in several courses. But it's implausible to think, based on those allegations, that no one of these institutions thought to check his references? The references that the plaintiff put down did not include Dr. Humphreys, and even though Dr. Humphreys was his primary piano teacher for the first two years of his graduate studies, he admittedly switched away from Dr. Humphreys and for the remaining years studied with a different... Are you holding it against him that he didn't list Humphrey as a reference? No, Your Honor, not at all. I thought that's one of the points the school makes, that he did not list him as a reference. Our reason for pointing that out is to show that, in fact, plaintiff's argument that Dr. Humphreys must have given him a negative reference and that must have been the reason why he was rejected for future employment was not a plausible allegation. Because he didn't list him. Because he didn't list him, that was one of the reasons. Why on earth would a person who's been sexually harassed list his harasser as a reference? We're not arguing that he should have been listed. Plaintiff here is... You're drawing some sort of inference from the fact that he did not. Yes, we are drawing... The inference you're drawing is that none of these other institutions would ever think to call up someone who wasn't listed as a reference by Mr. Herrera on his own applications. We submit that that gets into the question of whether it is possible that another institution would have contacted Dr. Humphreys, and that's a possibility. And your law firm, of course, for example, would never call up a professor that somebody in the law firm knew at an institution where an applicant was, if they were concerned about references. They would just call the people that the applicant listed. And every other employer operates that way. And academic employers operate that way. It's not a plausible inference. Your inference is not plausible, it seems to me, that if the allegations are true, I don't have any independent basis to know how important Humphreys is, but they allege that he's like the main guy, that he has contacts everywhere, that he's the guy who can place people. And that's part of the speculative nature of plaintiff's complaint. It's not speculative that A, he taught him, and B, he's chairman of the department. Those aren't speculative. Those are alleged facts. Yes, Your Honor. You don't think that they add a basis for an inference that he's the person another school would have contacted? I don't believe that they add that inference, at least at the stage that plaintiff is talking about, where he never even received a telephone interview, according to him. I would have thought that strengthens his case, not weakens it. Well, Your Honor, we contend that this really is in the realm of possibilities because, in fact, plaintiff still is saying he must have given a reference. Sure, it's a possibility. The question is, at a pleading stage, is it a plausible inference? To dismiss it as a mere possibility doesn't really tell us whether it's plausible or not. At the pleading stage, in order to get this to a viable cause of action, plaintiff would also have had to tie this to the alleged retaliatory motive or the alleged rejection of advances. The incident at the piano allegedly occurred four years before the plaintiff graduated. His point is the animus continued. And whether or not he has a continuing violation, his point with respect to retaliation is that the rejections he got were prompted by a continuing animus that existed within the limitation period. The alleged animus that he cites is that Dr. Humphreys allegedly stated that if you put your allegations in writing, I will make your life a living hell. He did not put his allegations in writing. So that's the first instance as to why the animus is not connected to an actual. You think that the statement from the department head was a technical pleading point and saying, I will hold it against you if you dare write it, but so long as you don't write it, I will have a perfectly fine assessment of you. Is that what you think he meant? No, Your Honor. No, of course not. At least on this complaint, he had an adverse animus, did he not? On the complaint, if in fact there had not already been a previous complaint where this allegation was somehow not included in the complaint and it was only when the defendants pointed out that all his allegations are time-barred and deficient that suddenly now plaintiff is recalling this statement. He graduated, yes? Yes, he did. And he alleges he was twice before his recital, his examination recital, solo recital, told that you're doing very well, you're likely to pass.  Yes, he does, Your Honor. And he also alleges that those who are told that almost always are passed, right? He does allege that, yes. Do you know of any case where Eastman has ever graduated a student with respect to an instrument who has twice failed the solo performance? I don't know one, well, other than the plaintiff, Your Honor. Yes, other than the plaintiff. Yes, they gave him yet another chance to pass his recital, which he did. They failed him. No, they gave him a third chance. Oh, a third. Yes, which is not mentioned in the complaint, but plaintiff mentions that in his reply. But my question was do you know of any case where Eastman has ever graduated a student who failed two solo performances? I don't know one way or the other. Do you know of any leading school that's ever done that? I don't know, and I think it is to the school's credit that, in fact, after the plaintiff complained that the reason he failed was not because of his own performance but because of Dr. Humphrey's alleged advances, that the school did not expel him after two failures but instead gave him another chance to pass, and he did. And the school also allowed him to switch piano teachers, as he requested, and thus he passed his remaining recitals and obtained his degree. And do you think there's any plausible inference from the fact that out of 28 schools, he gets not even one invitation for an interview? I think a plausible inference is that to the extent that he had to submit records of his performance, for example, or required cover letters, that they did not find that they were as good as the other candidates. This isn't in the record, but I know that university-level teaching jobs are not easy to find. You mean when they look at the record and notice he was flunked on two performances? They would not notice that. They wouldn't see that? No, they would not, Your Honor, and the complaint very carefully does not contain any allegation that these failures are reflected on the transcript. In fact, they are not, although that fact is outside the record. At the pleading stage, he has no way of alleging that he has had no discovery. He doesn't know whether that was disclosed to any of the 28 institutions. Again, that, at the pleading stage, though, the plaintiff is required to state allegations that state a cause of action. He does not have any allegation in there that his transcript influenced the prospective employers and that that is the reason why he did not receive. How can he know that without discovery? If it's sufficient to simply say, I think I didn't receive a job offer because I did not, because I graduated from a prestigious school, then under that reasoning, why wouldn't Derry? Of course, that would be a hopeless case. He doesn't say, I graduated and I didn't get a job and therefore I have a case. He says, I was told by the person who sexually harassed me that I'm not going to have much of a future if I put it in writing. He says that, right? That is his allegation, yes. Yes. And then he's got 28 schools where it's reasonable to infer at least one of them, probably half of them, contacted the chairman of the department who was his instructor. And we don't know the answer to any of that, do we? We don't know the answer. You don't think he's entitled to find out? No, Your Honor, I don't. Not under these circumstances. Thank you, Your Honor, and appreciate the consideration. Carlin, you've reserved two minutes. Just a very quick point. I'm the last case here. In a meeting with Dean Rolfe, it's alleged in the complaint that she said that Humphreys is on Dr. Herrera's list and would expect that future employers would call, email, or otherwise contact Humphreys to get feedback regarding Dr. Herrera's abilities to perform in his primary instrument. She stated that she received calls all the time, even though not listed as someone's reference. She further stated, we cannot get him out of your life. He has been your teacher for so long. So that is alleged in the complaint. That was the conversation that took place in one of the meetings. I have nothing further, Your Honor. Thank you, Mr. Carlin. We'll reserve the decision, and we are adjourned. Court is adjourned.